UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BENNY D. FARRAR, ) | |
|     Plaintiff, ) | |
| ) | Civil Action No. 3:09-cv-00604 |
| v. ) | Judge Nixon/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
|     Defendant. ) | |

To:  The Honorable John T. Nixon, Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 15,17). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 14). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and the decision of the Social Security Administration be **AFFIRMED**.

### I. INTRODUCTION

Plaintiff first filed for DIB on September 25, 2006, with an alleged onset date of November 30, 2000. (Tr. 124). Plaintiff later amended his onset date to August 31, 2005. (Tr. 216). He was last insured on December 31, 2005. (Tr. 216). Plaintiff's claim was denied initially and on reconsideration. (Tr. 6). Plaintiff requested and was granted a hearing, which

1

was held on December 11, 2008, with Plaintiff's attorney, David Downard, appearing on his behalf. (Tr. 15-42).[1] The ALJ issued an unfavorable decision on January 27, 2009. (Tr. 6-14).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

2. The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of August 31, 2005 through his date last insured of December 31, 2005 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following medically determinable impairments: history of degenerative joint disease [right knee]; history of left rotator cuff repair and clavicle resection; and history of degenerative disc disease [cervical spine] (20 CFR 404.1521 *et seq.*).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521).

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 30, 2000, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(c)).

(Tr. 11-14).

Plaintiff sought review from the Appeals Council on March 30, 2009. (Tr. 5). The Appeals Council denied Plaintiff's request for review on May 13, 2009. (Tr. 1). Plaintiff timely filed this action on June 30, 2009, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. *Id.*

---

[1] A hearing had originally been scheduled for September 20, 2008, but Plaintiff's original attorney withdrew from representing him on August 18, 2008. (Tr. 99). Plaintiff attended the hearing without counsel, and the ALJ advised Plaintiff that he might want to find a new attorney. (Tr. 43-50).

## II.  REVIEW OF THE RECORD

Plaintiff was born on January 8, 1957 and has a ninth-grade education.  (Tr. 192, 160). He previously worked as an electrician's helper, rubber processor, tire builder, and tow motor operator.  (Tr. 152).  Plaintiff last worked as a tow motor operator for Bridgestone/Firestone from 1996-2000.  (Tr. 152).  Plaintiff settled a worker's compensation claim against Bridgestone/Firestone on October 20, 2000 for injuries to his cervical spine and left shoulder. (Tr. 134).  Plaintiff alleges he is unable to work due to knee, shoulder, and cervical spine pain.

Beginning on October 15, 1996, Plaintiff saw Dr. James Renfro, an orthopedic surgeon, for left knee pain and swelling after a work injury.  (Tr. 306).  Dr. Renfro diagnosed probable chondromalacia.  (Tr. 306).  Dr. Richard A. Rogers provided a second opinion on December 5, 1996, noting likely chrondromalacia of the patella.  (Tr. 328).  Dr. Renfro performed an arthroscopic debridement of the patellofemoral joint of the left knee[2] on January 13, 1997.  (Tr. 223).

Plaintiff was placed on limited duty at work for a time, and Dr. Renfro suggested he stay off work for two to three weeks on January 20, 1997.  (Tr. 303-304).  On February 17, 1997, Dr. Renfro noted Plaintiff's knee was "moving a lot better" and felt better overall.  (Tr. 302).  He recommend quadriceps strengthening, no squatting, kneeling or climbing, and a reduced work schedule.  (Tr. 302).  Dr. Renfro recommended Plaintiff return to work on March 19, 1997, but that he should "avoid repetitive climbing."  (Tr. 301).  Dr. Renfro assessed Plaintiff to have a

---

[2] Dr. Renfro's Report of Operation states the operation was performed on the right knee, but there is no indication that this was the case.  Both the preoperative and postoperative diagnoses indicate the left knee had traumatic chondromalacia, and Plaintiff does not complain of surgery on the wrong knee.  (Tr. 223).

lower extremity impairment of 5% and a whole person impairment of 2% for worker's compensation purposes. (Tr. 301). On April 30, 1997, Dr. Renfro added Plaintiff should be permanently restricted from repetitive climbing, continuous squatting, and twisting with his knee. (Tr. 300).

Plaintiff saw Dr. Rogers again on April 21, 1999, complaining of a left shoulder injury following a tow motor accident. (Tr. 327). Dr. Rogers diagnosed probable rotator cuff strain in the left shoulder. (Tr. 327). Following Dr. Rogers's recommendation, Plaintiff obtained treatment via physical therapy in April 1999. (Tr. 323-26). Plaintiff next saw Dr. Rogers on September 16, 1999, complaining of left shoulder pain. (Tr. 319). Plaintiff continued on light duty, pursuant to Dr. Rogers's orders. (Tr. 319).

Dr. Rogers ordered an MRI of the left shoulder, which was taken on September 20, 1999. (Tr. 330). The radiologist noted changes that were "most consistent with a partial-thickness tear in the rotator cuff." (Tr. 330). After reviewing the MRI results, Dr. Rogers noted Plaintiff's pain was "somewhat better" on September 24, 1999, and he recommended Plaintiff continue shoulder exercises and remain on light duty. (Tr. 330).

After complaining to Dr. Rogers of left shoulder and neck pain on October 22, 1999, Plaintiff had an MRI of the cervical spine on October 27, 1999, which showed degenerative changes in C5-6 on the left side, which "may be a left paracentral disc bulge" and a herniated nucleus pulposus at the C6-7 level on the left side. (Tr. 316-17, 329). After review of the MRI results on November 2, 1999, Dr. Rogers gave Plaintiff a cervical traction device and referred him to a cervical specialist for potential surgery. (Tr. 316). Plaintiff was to continue on restricted duty. (Tr. 316).

4

On December 16, 1999, Dr. George Lien performed an anterior cervical diskectomy and arthrodesis, C6/7, with structural allograft and internal fixation on Plaintiff. (Tr. 228).

On January 20, 2000, Plaintiff again saw Dr. Rogers, complaining of pain in his left shoulder. (Tr. 315). He noted his pain was 70% improved after his cervical spine surgery, but he continued to have left shoulder pain. (Tr. 315). Dr. Rogers noted Plaintiff was ready to pursue surgery and recommended restricting Plaintiff's work overhead or outstretched on the left side. (Tr. 315).

On February 3, 2000, Plaintiff sought a second opinion for a possible partial tear of the rotator cuff from Dr. Malcolm E. Baxter, who practiced with Dr. Renfro. (Tr. 296-97). Dr. Baxter believed Plaintiff was "a good candidate for arthroscopic evaluation of the shoulder, with decompression and evaluation of the rotator cuff" and that he needed a distal clavicle resection. (Tr. 297). Dr. Baxter performed an arhtroscopic subacromial decompression and open distal clavicle resection on February 28, 2000. (Tr. 237).

Following his shoulder surgery, Dr. Baxter noted in a March 9, 2000 follow-up visit that Plaintiff was doing well and recommended physical therapy. (Tr. 295). Dr. Baxter allowed Plaintiff to return to light duty on March 13, 2000. (Tr. 295). On March 22, 2000, Dr. Baxter continued Plaintiff on light duty with a 10-pound weight restriction and no overhead or outside activities. (Tr. 294). After a number of follow-up appointments with Dr. Baxter, Plaintiff was allowed to resume regular work without permanent restrictions on May 10, 2000. (Tr. 290). A follow-up visit on July 17, 2000 confirmed Dr. Baxter did not place permanent work restrictions on Plaintiff based on his left shoulder. (Tr. 289).

According to the employer questionnaire supplied by JoAnn Watson, Plaintiff resigned

from Bridgestone/Firestone on December 1, 2000. (Tr. 185).

Plaintiff next sought treatment for his allegedly disabling conditions on August 5, 2005. (Tr. 288). Plaintiff complained to Dr. Renfro of knee swelling. (Tr. 288). Dr. Renfro opined there was "some progression of the known chondromalacia affecting the patellofemoral part of his knee," but that the progression was "mild," and Plaintiff had had only one swelling episode. (Tr. 288). Dr. Renfro suggested Plaintiff treat his symptoms with over-the-counter anti-inflammatory medication and released him with no restrictions. (Tr. 288).

After his DLI of December 31, 2005, Plaintiff saw Dr. Rogers, complaining of right shoulder pain, in September and October 2006. (Tr. 312-13). Beginning in 2008, Plaintiff also saw physicians at the Pain Management Group for treatment of his pain. (Tr. 335-67).

Plaintiff submitted a pain questionnaire on October 15, 2006, which was completed by his wife. (Tr. 163-66). Plaintiff indicated that his arms "go to sleep" since his surgery in December 1999, and he has bouts of dizziness and headaches. (Tr. 163). Plaintiff stated he took Topomax, Sulindac, and Propoxyphene, as well as over-the-counter pain medications, and that the pain began after his on-the-job accident in 1999. (Tr. 163-64). He also stated that he used traction, pillows, and heat to help alleviate the pain. (Tr. 164-66). Plaintiff further noted he is confined to the house on most days and has pain when walking and lifting his arms. (Tr. 164-65).

Plaintiff submitted a function report completed by his wife, also dated October 15, 2006. (Tr. 168-75). Plaintiff indicated he was able to do some light housework on good days. (Tr. 170). He also stated he has permanent restrictions prescribed by his doctors due to his neck, knee, and shoulder problems. (Tr. 173). Plaintiff stated he has some mental and social problems

6

due to his pain medication. (Tr. 173-74).

On December 6, 2006, Dr. Louise G. Patikas, a DDS medical consultant, completed a review of Plaintiff's file. (Tr. 331-34). Dr. Patikas concluded Plaintiff's file was technically insufficient, due to the lack of sufficient medical records during the timeframe alleged. (Tr. 331-34).

At his hearing before the ALJ on December 11, 2008, Plaintiff testified he had tried to do some yard work, but his back hurt too much. (Tr. 22). He stated he did not see any doctors between 2000 and 2005 because he was told there was nothing they could do. (Tr. 23). Plaintiff indicated he had been prescribed pain medications around the time of his accident, but he then used Aleve and heat to treat his pain between 2000 and 2005. (Tr. 24, 34). Plaintiff testified he resigned from Bridgestone/Firestone as part of the settlement agreement. (Tr. 27). Plaintiff believed he could not see any of his previous worker's compensation doctors because he sold his right to medical benefits as part of his settlement, but he has been covered under his wife's insurance since he left work. (Tr. 28-29). Plaintiff stated his left knee swells almost daily, but he keeps it elevated to reduce swelling. (Tr. 38). He believes surgery worsened his left shoulder, and he currently cannot raise his left arm more than halfway. (Tr. 39).

### III.  CONCLUSIONS OF LAW

A.   Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the

7

process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined

whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Here, the ALJ found Plaintiff's impairment did not meet a severe impairment at step two, and Plaintiff was therefore not disabled as of his date last insured ("DLI").

C. Plaintiff's Statement of Error

Plaintiff identifies three errors for review. First, "[t]he ALJ failed to consider medical evidence dated after the claimant's date last insured (DLI) and whether this evidence 'relates back.'" Second, "[t]he ALJ erred in not applying SSR 83-20 to determine whether the claimant was disabled prior to his DLI." Third, the "[c]redibility of claimant's statements [was] not properly evaluated and assessed as required by SSA Ruling 96-7P."

Plaintiff argues that the ALJ erred by ignoring the post-DLI evidence, which purportedly shows deterioration of his alleged disabling conditions. There can be no argument that post-DLI evidence is irrelevant if it cannot "confirm a finding of disability during the relevant time period." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). In considering a

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

9

claimant's disability, an "ALJ must 1) consider post-DLI evidence to the extent it is relevant to conditions existing during a claimant's period of eligibility and 2) the date of that evidence is a factor to be considered in assigning relative weight to that evidence." *Sweitzer v. Astrue*, 2009 E.D. 3064665, *3 (E.D. Tenn. Sept. 23, 2009).

Plaintiff submitted no relevant medical records from January 1, 2001 to August 2005. On August 5, 2005, Plaintiff saw Dr. Renfro for treatment of his left knee. (Tr. 288). Plaintiff indicated the reason for his visit was swelling in the knee in the last week. (Tr. 288). X-rays taken of Plaintiff's left knee were unremarkable. (Tr. 288). Dr. Renfro noted Plaintiff should manage intermittent flare-ups with over-the-counter anti-inflammatory medication and released Plaintiff with no restrictions. (Tr. 288). There is no evidence Plaintiff sought additional treatment for his alleged disabling conditions prior to filing his application.

The ALJ in this case properly excluded the post-DLI evidence. Essentially all evidence of Plaintiff's alleged disabling conditions arose prior to 2001 or after September 2006. Between his alleged onset date and DLI, Plaintiff sought medical care only one time, in the unremarkable visit with Dr. Renfro on August 5, 2005.[4] Moreover, the medical evidence dating prior to Plaintiff's DLI suggested Plaintiff's left shoulder had improved, with "near full range of motion" and no permanent restrictions as of July 21, 2000. (Tr. 289). Plaintiff had last sought treatment for his knee on February 25, 1998, when he received an injection in his left knee. (Tr. 298). The record reflects Plaintiff's cervical spondylosis was treated with surgery on December 16, 1999, and Plaintiff "had complete arm pain relief" and "full strength in his upper extremities" following the

---

[4] Plaintiff saw Dr. Gary Schwartz on March 18, 2004, complaining of a cough and chest congestion.

surgery. (Tr. 228). Thus, to the extent pre-DLI evidence exists in the record, there is substantial evidence that Plaintiff's alleged disabling conditions had improved as of the DLI. Given so few medical visits between 2001 and 2005, the Magistrate Judge is also reluctant to find that the post-DLI evidence is significantly close in time to be probative of Plaintiff's condition at the DLI. The Magistrate Judge therefore believes the ALJ properly excluded the post-DLI evidence in this case. The Magistrate Judge notes that the ALJ did not clearly articulate his reasons for excluding the post-DLI evidence. While not error in this case, the ALJ would be well-advised to fully document his evaluation of such evidence in the future.

As for Plaintiff's second alleged error, the Magistrate Judge agrees with the Defendant that SSR 83-20 does not apply in this case. The Sixth Circuit has clearly stated that SSR 83-20 "applies only when there has been a finding of disability and it is necessary to determine when the disability began." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). Because the ALJ in this case determined Plaintiff did not have a severe impairment and was therefore not disabled, SSR 83-20 is inapplicable. The ALJ was not required to call a medical advisor to determine the onset date of disability.

Plaintiff also raises issue with the ALJ's determination that Plaintiff's statements regarding his symptoms were not entirely credible. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Here,

Plaintiff did not seek medical treatment for his allegedly disabling conditions for approximately five years, even though he was insured. Plaintiff also testified that he used heat and over-the-counter pain medications to relieve his pain. (Tr. 34). Given the absence of evidence that Plaintiff sought medical treatment for his pain, back, joint, and shoulder problems, combined with Plaintiff's use of over-the-counter remedies, the ALJ's determination of Plaintiff's credibility is appropriate and supported by substantial evidence.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and the decision of the Social Security Administration be **AFFIRMED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 22nd day of March, 2010.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge